# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:                                    CIVIL ACTION

**DOROTHY CHASE STEWART**                 NO. 08-3225
                                          c/w 08-3669, 08-3852, 08-3853, 08-4805

                                          [REF: 08-3225, 08-3669, 08-3852, 08-3853]

                                          SECTION "C" 4


## ORDER AND REASONS

Before the Court is appellant Wells Fargo's appeal of two opinions issued by the

Bankruptcy Court (Civil Action 08-3225, *In re Dorothy Chase Stewart* and Civil Action 08-

3852, *In re Irby Fitch*) and Wells Fargo's appeal of Administrative Order 2008-2 (Civil Action

Nos. 08-3669 and 08-3853).[1]  This Court heard oral argument on the appeals.  Based on oral

argument, the memoranda by parties and the United States Trustee, and the record in this case,

the Court denies Wells Fargo's appeals.

---

[1] The Court notes that the parties agreed at oral argument that the substance of the
Bankruptcy Court's opinion regarding the disallowance of certain claims is not on appeal in *In re
Irby Fitch*, Civil Action 08-3852.  (Rec. Doc. 53 at 23.)  This is consistent with appellant's actual
briefing in 08-3852 in contrast to the issues listed in the Notice of Appeal.  Appellant's brief
only addresses whether the escrow account analysis in the *Fitch* opinion and Administrative
Order 2008-2 exceeded Bankruptcy Court's authority.  (See 08-3852, Rec. Doc. 10).  As 08-
3852 does not raise any specific factual issues or circumstances for this Court to decide or
consider and as the arguments in 08-3852 are identical to those raised in 08-3853 and 08-3669,
the arguments of 08-3852 are addressed primarily in Section IV: Legal Analysis - Administrative
Order 2008-2, except where otherwise noted.

## I.  BACKGROUND

On April 10, 2008, the United States Bankruptcy Court for the Eastern District of Louisiana  issued its opinion and judgment regarding an objection filed by debtor Dorothy Stewart to creditor Wells Fargo's proof of claim.  (Rec. Doc. 1-4 and 1-5.)  After several evidentiary hearings, the Bankruptcy Court disallowed portions of Wells Fargo's claim, including assessments of late fees and property inspection fees, corrected Wells Fargo's accounting of debtor's escrow account, and assessed monetary and equitable sanctions against Wells Fargo.  In addition to ruling on the assessment of particular fees and assessing damages, the April 10, 2008 *Stewart* judgment required Wells Fargo "to conduct an audit of all proofs of claim filed on its behalf in this District in cases pending on, or filed after, April 13, 2007, and to provide a complete loan history on every account."   (Rec. Doc. 1-5 at 24.) For pending claims, Wells Fargo was "ordered to amend, where necessary, the proofs of claim already on file to comply with the principles established in this case and *Jones*." (Id.)   Wells Fargo's Notice of Appeal was transmitted to this Court on May 12, 2008.  (Rec. Doc. 1.)  Wells Fargo also appeals the May 8, 2008 Administrative Order 2008-2 issued by the Bankruptcy Court.  (08-3669, Rec. Doc. 1)  Oral argument on the appeals was held on November 26, 2008 and subsequently taken under advisement.  (08-3225, Rec. Doc. 51.)


## II.  STANDARD OF REVIEW

The Fifth Circuit has consistently held that the standard of review applicable to bankruptcy appeals in a district court is the same as the standard applied by a Court of Appeals to a district court proceeding. *In re Killebrew*, 888 F.2d 1516, 1519 (5th Cir.1989).  This Court

reviews factual findings of the bankruptcy court for clear error, Fed. R. Bankr. P. 8013, and

conclusions of law, and mixed conclusions of law and fact are reviewed *de novo*. *In re Nation*

*Gypsum Co.*, 208 F.3d 498, 504 (5th Cir.2000). A finding is clearly erroneous when, although

there is evidence to support it, the reviewing court, on the entire record, is left with the definite

and firm conviction that a mistake has been made. *U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 395,

68 S.Ct. 525, 92 L.Ed. 746 (1948). The burden is on the appellant to demonstrate that the

bankruptcy court's findings are clearly erroneous. *In re Drehsen*, 190 B.R. 441,442

(M.D.Fla.1995). Finally, the imposition of sanctions is a matter of discretion for the bankruptcy

court; thus, reviewed under an abuse of discretion standard. *See Shipes v. Trinity Indus.*, 987

F.2d 311, 323 (5th Cir.), *cert. denied*, 510 U.S. 991, 114 S.Ct. 548, 126 L.Ed.2d 450

(1993)*;Matter of Sadkin*, 36 F.3d 473, 474 (5th Cir. 1994.)


### III.     LEGAL ANALYSIS - DEBTOR STEWART

   *A.     Late Fees and Application of Payments:*

The Bankruptcy Court found that Wells Fargo misapplied debtor's payments such that

several payments were deemed late because those payments were applied to past due and not

current amounts due.  The *Stewart* Opinion interpreted the Note and Mortgage at issue and

concluded that under the terms of the Mortgage, all payments received must be applied as

follows:  1) prepayment charges; 2) funds necessary to satisfy property taxes or insurance

premiums; 3) accrued interest; 4) accrued principal; and finally, 5) late charges.   (08-3225, Rec.

Doc. 1-4 at 8.)  Under this interpretation of the Note and Mortgage, if debtor misses a payment,

the next payment made would apply to the current interest and principal due, then to the past

interest and principal due, and then to any late charge assessed.

In this case, for example, debtor missed her monthly payment of $554.11 in December 2000. (Rec. Doc. 19 at 13.) The Bankruptcy Court found that debtor resumed timely monthly payments for January, February, and March 2001, i.e. the payment was received within 15 calendar days of the contractual due date for that month. (Rec. Doc. 1-5 at 9.) In fact, she paid more, presumably intending to whittle down the missed payment. She was nevertheless assessed late fees for December 2000, January 2001, February 2001, and March 2001. (Id.) The January 2001 payment of $654.11 was not applied by Wells Fargo to the January debt but to the December 2000 principal and interest amount, then to the December late fee of $27.71, with the remainder placed in a "suspense account." (Rec. Doc. 19 at 13.) As a result of applying the January payment to December's debt, debtor's account was still deficient for the amount due in January. This cycle then repeated itself in February and March 2001, with payments applied to the principal, interest and late fee for the month prior. The Bankruptcy Court found that "[t]he total cost to Debtor for one missed $554.11 installment in December of 2000 was $465.36 in late fees and property inspection charges." (Rec. Doc. 1-4 at 21.) According to Judge Magner's interpretation of the Note and Mortgage, Wells Fargo should have applied the January 2001 payment to January 2001 interest and principal, and then the remainder to the outstanding December 2000 interest and principal and then, if any remained, to any late fee assessed.

In Louisiana, "contracts have the effect of law for the parties." La. Civ.Code art.1983. Under La. Civ.Code art. 2045: "Interpretation of a contract is the determination of the common intent of the parties." The interpretation of an unambiguous contract is an issue of law for the court to decide. *Amoco Production Co. v. Texas Meridian Resources Exploration Inc.,* 180 F.3d

664, 668 (5th Cir.1999). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties intent." La. Civ.Code art.2046. "In addition, a contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." *Texas Eastern Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir.1998). "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text." La.Civ.Code art. 2055. *Guilbeau v. C & D Reprographics-Lafayette, Inc.*, 568 So.2d 206 (La.App.1990), writ denied, 571 So.2d 653 (La.1990).

Wells Fargo first argues that it applied the payments correctly under Louisiana law. Under the terms of the Note and Mortgage, Wells Fargo is authorized to collect five percent of the overdue payment of principal and interest as a late fee for any payment not received within 15 days of the due date. (USBC, EDLA Case No. 07-11113, Rec. Doc. 1-1 Part 2 at 2, 11.) The Note and Mortgage are silent as to the application of payments to past due amounts.

Instead, Wells Fargo relies on Louisiana Civil Code Art. 1868, which states in part that payments must be applied to the "debt that became due first." (Rec. Doc. 19 at 26.) However, this selective citation ignores the larger statutory scheme regarding the application of payments when multiple debts are due. First, under La. C.C. Art. 1864, it is the obligor (in our case the debtor) who "has the right to impute payment to the debt [she] intends to pay." *See VVP America, Inc. v. Design Build Development Services*, Inc. 951 So.2d 461, 470 (La.App. 2 Cir. 2007)(applying Art. 1864); *but see State ex rel. Hastings v. Hastings*, 829 So.2d 1084, 1087 (La.App. 3 Cir. 2002)(noting that application of Art. 1868 to oldest debt also protects creditors

from prescription of debt.)  Moreover, debtor's imputing of payment may be express or "may be inferred from circumstances known to the obligee."  La. C.C. Art. 1864.  To determine whether the payment was express, courts have looked to whether a payment coupon was enclosed or whether the obligor noted the specific debt on the check.  *See Ford Motor Credit Co. v. Hogg*, 351 So. 2d 1324 (La. App. 2 Cir. 1977.)

Based on the record before it, the Court is unable to determine if debtor expressly imputed her payment to a particular debt.  For example, the Court does not have before it the cancelled checks written by plaintiff, nor is there any indication of whether she enclosed a coupon or correspondence indicating imputation.

The Court does find, however, that the circumstances known to the obligee indicate an inferred imputation to the most current debt.  The debtor missed her December 2000 payment.  Her next payment was for the exact amount due in January 2001, plus an additional one hundred dollars.  She continued to make monthly payments thereafter and her payments through April were each approximately one hundred dollars greater than the monthly amount due.  (USBC, EDLA Case No. 07-11113, Rec. Doc. 40, Ex. 1.)  The logical inference is that the debtor was imputing each payment to her current debt, with any remaining amount to address the amount in default from her December 2000 payment.

In addition, the Court finds that Wells Fargo misreads La. C.C. Art. 1868.  The full text states:

> When the parties have made no imputation, payment must be imputed to the debt that is already due.
> If several debts are due, payment must be imputed to the debt that bears interest.
> If all, or none, of the debts that are due bear interest, payment must be imputed to the debt that is secured.
> If several unsecured debts bear interest, payment must be imputed to the debt that,

because of the rate of interest, is most burdensome to the obligor.
If several secured debts bear no interest, payment must be imputed to the debt
that, because of the nature of the security, is most burdensome to the obligor.
**If the obligor had the same interest in paying all debts, payment must be
imputed to the debt that became due first.**
If all debts are of the same nature and became due at the same time, payment must
be proportionally imputed to all.

La. C.C. Art. 1868 (emphasis added). Debtor Stewart did not have the same interest in paying

all of her debts, i.e. the past due debt and the amount currently owed. If she paid the past due

debt, she would have risked incurring an additional late fee for failing to pay the current debt. If

she paid the current debt and included an additional sum to be applied to the missed payment,

she would not risk an additional late fee. As such, Art. 1868 does not support appellant's claim

that it properly applied the debtor's payments.

As a matter of law, the Court finds that the Bankruptcy Court's interpretation that neither

the Note nor the Mortgage require that payment be applied to the past due amount to be correct.

Wells Fargo spends quite a bit of time arguing that it is allowed to assess a late fee for each

overdue monthly payment under the terms of the Note. This argument misses the point. If the

payments are not "late" under the terms of the contract, then Wells Fargo is prohibited from

assessing the fee.

The Bankruptcy Court noted that the debtor never received notice of the assessment of

late fees against her account or that the payments were being applied to past due amounts first,

essentially keeping debtor in default. Wells Fargo does not contest that debtor did not receive

notice of past due payments, late fees, or inspection fees. Rather, it claims that notice is only due

to the debtor when payment is demanded under the terms of the Mortgage. Paragraph 7 of the

Mortgage states that amounts disbursed by the Lender under this paragraph "shall become

additional debt of Borrower. . . . these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment." (USBC, EDLA Case No. 07-11113, Rec. Doc. 1-1, Part 2 at 8.) Wells Fargo argues that the late fees serve two goals: 1) providing an incentive to keep the account current and 2) covering the additional collection costs incurred when attempting to bring the account current. The first goal, however, appears to be undermined if in fact the debtor never receives notice of the late fee until long after the fee is incurred. Although this Court is also troubled by the possibility of the accrual of fees (and interest thereon) over several years without any notice to the debtor until she files for bankruptcy,[2] the lack of notice was not the legal basis for the Bankruptcy Court's ruling and is therefore irrelevant for purposes of this appeal.

 

      B.      *Broker price opinions and inspection fees:*

Wells Fargo claims it had 44 inspections and 9 broker-price opinions prepared on debtor's property. The fee assessed against the debtor for each inspection is $15.00 and $125.00 for each broker-price opinion. The Bankruptcy Court assessed the reasonableness of the inspections, based on the terms of the mortgage, and struck any fees for inspections she considered unreasonable. The *Stewart* Opinion also only allowed costs to be assessed for two of the nine broker price opinions, primarily because Wells Fargo could not produce any supporting

---

[2] In the context of escrow accounts, bankruptcy courts have held that failure to provide notice and yet to continue to accept payments effectively waives a lender's right to recover the additional sums. *See e.g., In re Payne,* 387 B.R. 614, 633 (Bkrtcy.D.Kan., 2008)(disallowing post-petition inspection fees when charged without notice or cause.) However, escrow accounts and post-petition charges are subject to certain disclosure provisions and therefore arguably may be subject to a different standard.

documentation, such as the actual reports generated, for those charges other than the invoice.[3] The Bankruptcy Court also reduced the price from $125 to $50 because Wells Fargo represented that $50 was the actual cost charged by Premiere Asset Services.

Wells Fargo argues that it is entitled under the terms of the Mortgage to "'do and pay for whatever is necessary' to protect the value of the property." (Rec. Doc. 19 at 19, *citing* USBC, EDLA Case No. 07-11113, Rec. Doc. 1-1, Part 2 at 8.) Wells Fargo claims that ordering an inspection after payment is more than 20 days delinquent provides "critical" information for protecting the collateral. (Rec. Doc. 19 at 15.) In this case, however, Wells Fargo did not order property inspections until July 2001 although appellant claims debtor's account was past due as of December 2000. (Rec. Doc. 1-4 at 23.) More troubling is even once ordered, the inspection reports were apparently never actually reviewed by a living breathing person. If they had been, that person would have realized that the inspections were performed on different properties entirely. For example, the *Stewart* Opinion cites an inspection completed on July 5, 2001 describing a brick house, whereas later inspections in 2002 describe a "house of frame construction." (Rec. Doc. 1-4 at 25.)

This Court also agrees the Bankruptcy Court's interpretation of the Mortgage and its requirement that inspections be reasonable. Paragraph 9 of the Mortgage states "Lender or its

---

[3] Wells Fargo does not specifically argue that the Bankruptcy Court should have allowed Wells Fargo to claim all nine broker-price opinions. In an abundance of caution, this Court notes the following factual findings by the Bankruptcy Court, which do not appear to be clearly erroneous. The Bankruptcy Court found duplicative charges for opinions invoiced for September 30, 2004 and for September 12, 2005. (Rec. Doc. 1-5 at 2-3.) Moreover, the property was unavailable for inspection in 2005 due to a general evacuation order still in effect following Hurricane Katrina. (Id.) The 2006 charges again appear to be duplicative and appear to have been reversed in October 2006. (Id.) Wells Fargo owned the property in 2007 and therefore is responsible for the 2007 broker-price opinion charges. (Id.)

agent may make reasonable entries upon and inspections of the Property.  Lender shall give

Borrower notice at the time of or prior to an inspection specifying reasonable cause for the

inspection."    (USBC, EDLA Case No. 07-11113, Rec. Doc. 1-1, Part 2 at 9.)  As the terms of

the Mortgage establish a reasonableness standard for each inspection, the Bankruptcy Court was

correct in assessing whether an inspection could be considered reasonable.  As a factual matter,

the Bankruptcy Court reviewed the records and found that inspections were only reasonable for

the month where the debtor had missed or skipped a payment.   (See e.g., USBC, EDLA Case

No. 07-11113, Rec. Doc. 1-5 at 18.)  Inspections were unreasonable, however, where the debtor

was making regular monthly payments.  (Id.)  This was underscored by the fact that each

inspection indicated the property was occupied and well maintained, which also made

subsequent inspections unreasonable.[4]

As to the broker-price opinions, Wells Fargo argues the Bankruptcy Court had no

authority to reduce the rate charged per broker-price opinion from approximately $95.00 -

$125.00 to $50.00 per opinion.  (Rec. Doc. 19 at 35.)  Wells Fargo misinterprets the Bankruptcy

Court's opinion and claims the *Stewart* Opinion found the fee charged to be per se unreasonable.

Rather the Bankruptcy Court relied on trial testimony that indicated that borrowers are only

assessed the charges billed by a third party, in this case Premiere Asset Services (hereinafter

"Premiere").  (Rec. Doc. 1-5 at 3.)  The record in this case included nine invoices for broker-

price opinions from Premiere.  After trial, the Bankruptcy Court was informed that Premiere was

---

[4]The Bankruptcy Court also discussed notice prior to an inspection.  However, despite
these comments, the Bankruptcy Court did allow some inspection fees even when notice had not
been provided to the debtor.  Therefore, notice was not the determining factor in whether or not
an inspection fee was allowed.

not a third party at all, but rather a division of Wells Fargo. (Id.) Moreover, Wells Fargo's national counsel represented to the Court that the actual cost incurred is $50.00. (Id.) Wells Fargo implies in its briefing that the Bankruptcy Court simply dreamed up the $50.00 price tag for a broker-price opinion. Such an inference is unwarranted given the record in this case. Any reference to illegality in the Bankruptcy Court's opinion must be understood in this context, given the representations of Wells Fargo's own counsel. At trial, counsel for Wells Fargo represented borrowers are only charged the actual cost of obtaining the broker-price opinion. Counsel for Wells Fargo subsequently represented what the actual cost was per broker-price opinion. To take a contrary position on appeal, namely that Wells Fargo is entitled to add a sur-charge or otherwise profit from these fees, is disingenuous at best.

C.      *Escrow Accounts*

In June 2001, Wells Fargo notified the debtor that she had to procure hazard insurance for the property because she had failed to maintain property insurance. Wells Fargo calculated her additional monthly payments as $144.66. At the time that the escrow account was initiated, debtor had funds in her suspense account. The Bankruptcy Court, relying on the terms of the Note, held that Wells Fargo incorrectly calculated the monthly escrow amounts because it held funds in suspense accounts, but did not apply them to the escrow shortage before calculating the monthly amount due.

Wells Fargo responds that it is not required to do so under the Real Estate Settlement Procedures Act (hereinafter "RESPA") or its implementing statute. (Rec. Doc. 19 at 41.) Even if it had, Wells Fargo argues that then those funds would not have been available to later

contribute to payments for principal and interest.

This Court agrees with the Bankruptcy Court's conclusion that the terms of the Note required Wells Fargo to count the amounts in the suspense account against the escrow shortage prior to calculating the monthly amount due. As discussed earlier, the terms of the Note require all payments received to be applied as follows: 1) prepayment charges; 2) funds necessary to satisfy property taxes or insurance premiums; 3) accrued interest; 4) accrued principal; and finally, 5) late charges. (USBC, EDLA Case No. 07-11113, Rec. Doc. 1-1, Part 2 at 7.) Simply because the lender holds funds in a suspense account does not justify ignoring the clear instructions of the Note to apply payments if necessary to escrow shortages due to property taxes or insurance premiums and before accrued interest and principal. The debtor had a positive balance in her suspense account when her escrow account. That amount should have been counted in reducing her monthly assessment.

Nor does RESPA forbid what the Note in this case requires. RESPA is a remedial consumer-protection statute. 12 U.S.C. § 2601(a). Congress enacted RESPA to insure consumers are provided with information regarding the nature and costs of servicing their home loans. *Id.* Indeed, RESPA specifically states that it does not affect the validity of any contract, loan agreement or mortgage. 12 U.S.C. § 2615. Moreover, appellant fails to cite any specific provision of either RESPA or its implementing statute, Regulation X, that would prevent the counting of suspense funds in assessing the escrow monthly fee.[5] Accordingly, the Court finds

---

[5] Appellant relies on statutory language that allows (but does not require) a lender to establish an escrow account for the purpose of paying taxes and insurance premiums for example. See 12 U.S.C. § 2609. From this broad language, and without further citation or elaboration, Wells Fargo concludes that a debtor may not pay additional sums toward her escrow account, such as through the application of suspense funds.

that the terms of the Note control in this instance and that as a matter of law, Wells Fargo should

have counted the balance debtor's account against the deficit in debtor's escrow account prior to

calculating the monthly amount due.

D.      *Power and Authority of the Bankruptcy Court:*

The crux of Wells Fargo's arguments regarding the Bankruptcy Court's authority arise

out of the lower court's order in the *Stewart* Opinion for Wells Fargo to audit and where

appropriate submit amended proofs of claim for certain cases in the Eastern District of

Louisiana.  Specifically, the *Stewart* Opinion orders Wells Fargo to

> audit every proof of claim it has filed in this district in any case pending on or
> filed after April 13, 2007, and to provide a complete loan history on every
> account.  For every debtor with a case still pending in the District, the loan
> histories shall be filed into the claims register and Wells Fargo is ordered to
> amend, where necessary, the proofs of claim already on file to comply with the
> principles established in this case and *Jones*.  For closed cases, Wells Fargo is
> ordered to deliver to Debtor, Debtor's counsel and Trustee a copy of the
> accounting.

(Rec. Doc. 1-5 at 24.)   Wells Fargo argues that the Bankruptcy Court exceeded her authority in

the *Stewart* Opinion and thereby violated the Constitution and the Bankruptcy Code.

Specifically, Wells Fargo claims that the audit portion of the opinion violates the Constitution's

requirement of a case or controversy by determining "outcomes of disputes before they even

exist and because it usurps the authority delegated by Congress to the United States' Trustees."

(Rec. Doc. 44.)  As such, Wells Fargo argues that the *Stewart* Opinion creates "new substantive

rights" in violation of the Bankruptcy Code and Section 502, In addition, appellant argues that

the audit and amend aspects of the opinion create new "substantive rights," and therefore is a

violation of the Bankruptcy Code and exceeds the Bankruptcy Court's authority under Section

105.

Wells Fargo's entire line of arguments rests squarely on the assumption that any proof of claim filed by Wells Fargo is "*prima facie* evidence of the validity and amount of the claim." *See* Bankr. R. 3001(f).[6] Appellant reasons that if a proof of claim is already *prima facie* valid, then the lower court's order violates the Bankruptcy Code and the Constitution by creating a case or controversy where there was no prior objection by the other party. As such, appellant argues that the Bankruptcy Court is substantially determining the outcome of an objection that has not been lodged and thereby circumvents the statutory and procedural framework for disputed a *prima facie* claim. However, Wells Fargo's reading of the relevant statute and rules is overbroad.

The filing of a proof of claim, in and of itself, is not what entitles the proof of claim to *prima facie* status. Rather, it is the supporting documentation, required by Bankr. R. 3001(c), not the simple filing of the document, that provides *prima facie* status. *See In re Sandifer*, 318 B.R. 609 (Bankr. M.D. Fla. 2004); *see also In re Gilbreath*, 395 B.R. 356, 361-65 (Bankr.S.D.Tex. 2008)(holding that creditor's failure to comply with Bankruptcy Rule 3001 and

---

[6] Wells Fargo also claims the Bankruptcy Court violated 11 U.SC. § 502, which states "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." This argument overextends the actual order by the Bankruptcy Court. Whether or not a claim is actually "allowed" is not at issue in the Bankruptcy Court's opinion. Rather, the adjudication of "allowed" and "disallowed claims," if the debtor objects to the amended proof of claim, follows afterwards.

Instead, the Bankruptcy Court, by ordering the filing of loan histories and the presentation of documentation to support the claim is addressing the procedural validity of the proof of claim. The only possible substantive aspect that would be affected in amending the claim to comply with the findings of *Stewart* and *Jones* is where the Note and Mortgage contain exactly the same language as that of debtor Stewart. In such cases, Wells Fargo is on notice that the Bankruptcy Court has construed the exact same contractual language to require for example, application of suspense funds to the calculation of the escrow balance before estimating the monthly escrow amount. But where the contractual language differs, appellant would be free to include the amounts it deems required by its own interpretation of the contract.

the instructions on the official proof of claim form deprived the claim of *prima facie* validity.)

Under Bankruptcy Rule 3001(a), a proof of claim must "conform substantially to the appropriate

Official Form." Bankr. R. 3001(a). Paragraph 7 of Official Form 10 requires the creditor to

"[a]ttach redacted copies of any documents that support the claim, such as promissory notes,

purchase orders, invoices, itemized statements or running accounts, contracts, judgments,

mortgages, and security agreements" or a summary of such documents. Paragraph 7 of Official

Form 10 also requires that "[i]f the documents are not available, please explain." In addition,

courts have required the claimant to allege facts in the proof of claim sufficient to support the

claim. *See e.g., Robinson v. Hinkley (In re Hinkley)*, 58 B.R. 339, 348 (Bankr.S.D.Tex.1986),

aff'd, 875 F.2d 859 (5th Cir.1989). Only if the facts are sufficient is a proof of claim afforded

*prima facie* status. *Id.*; *see also In re Lasky*, 364 B.R. 385, 387, (Bkrtcy.C.D.Cal. 2007)(holding

in Ch.7 bankruptcy case that a summary of charges must include 'some breakdown of interest

and other charges.') "The ultimate burden of proof always rests upon the claimant." *Matter of

Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988).

In this case, the Bankruptcy Court exhaustively detailed the insufficiency of Wells

Fargo's proofs of claim filed in this matter. Judge Magner found that Wells Fargo listed charges

on its proofs of claim in this and previous related matters "without explanation or

substantiation." (Rec. Doc. 1-5 at 22.) In addition, many of these charges simply did not appear

on debtor's account history. (Id.) Even Wells Fargo noted in its first reply to the plaintiff's

objection to the first proof of claim filed in this case that

> Wells Fargo believes the amount of the regular monthly payment for the months
> in default listed in its proof of claim may inadvertently include an amount already
> included in the escrow shortage listed in the proof of claim. Wells Fargo is taking
> great care into looking into the matter and agrees to provide a breakdown of the
> month1y installments included in the arrearages by the date of the hearing.

(USBC, EDLA Case No. 07-11113, Rec. Doc. 30 at 3.)  Wells Fargo eventually filed three

proofs of claim in this case, not including the proofs of claim filed in the debtor's 2004 and 2007

bankruptcies, which the Bankruptcy Court found to be "significantly erroneous."  (Rec.Doc. 1-4

at 5; Rec. Doc. 1-5 at 22.)  In fact, the lower court found Wells Fargo's proofs of claim to be so

misleading that it sanctioned appellant $2,500 for its conduct. (Rec. Doc. 1-5 at 24.)  All told, it

took three hearings and four months of research to untangle the accounting in this case.  (Rec.

Doc. 1-5 at 20.)  Based on the Bankruptcy Court's exhaustive review of the many systemic

mistakes in the proofs of claim filed by Wells Fargo through several cases, Wells Fargo's claims

no longer merit *prima facie* validity.

In an unpublished decision, the Fifth Circuit affirmed a bankruptcy court finding that

because a proof of claim was insufficient, and therefore did not attain *prima facie* validity, the

burden never shifted to the debtor to object. *In re Sunrise Systems*, Inc.,  105 F.3d 656 (5th Cir.

1996); *see also In re Tran*, 369 B.R. 312, 318 (S.D.Tex. 2007)(holding debtor "has no

evidentiary burden to overcome" in objecting to a claim that is not *prima facie* valid.)  The

Bankruptcy Court, based on its findings of Wells Fargo's conduct in *Stewart* and *Jones*, has

simply provided an earlier opportunity for Wells Fargo to supplement or amend where

necessary.  The *Stewart* Opinion is consistent with remedies in individual cases of inadequate

proofs of claim, where courts have allowed creditors to supplement or amend their proofs of

claim where denied *prima facie* validity.  *See e.g.,  In re Henry*, 311 B.R. 813 (Bankr. W.D.

Wash. 2004)(discussing remedies when claimant's proof of claim is insufficient.)  As such,

Wells Fargo's arguments that the lower court's order creates a dispute where none exists or

otherwise circumvents the Bankruptcy Code's procedures for disputing proofs of claim ignore

16

the fact that the initial proof of claim is insufficient to shift the burden to debtor and that amendment in such cases is encouraged.

 

      *E.*      *Authority and Basis for a Section-Wide Remedy*

     This matter is not the only case where Wells Fargo has filed insufficient proofs of claim. Combined with the insufficiency found in this bankruptcy matter, as well as debtor's previous 2004 and 2007 bankruptcies, the Bankruptcy Court also encountered similar accounting difficulties in another Wells Fargo claim. In *Jones*, the Bankruptcy Court found that Wells Fargo employed systematic accounting practices that produced inaccurate and misleading reporting of the amounts owed by debtors. *In re Jones*, 366 B.R. 584, 591 (Bkrtcy.E.D.La. 2007) *aff'd in part*, *Wells Fargo Bank, N.A. v. Jones*, 391 B.R. 577, 596 (E.D.La. 2008.)(listing a series of accounting errors by Wells Fargo). For example, the Bankruptcy Court found that Wells Fargo's proof of claim overstated the costs that were actually incurred. *Id*. Moreover, the testimony by Wells Fargo representatives in the instant matter indicate that the problems incurred in this case were systematic and pervasive.

     Put simply, Wells Fargo relies on an extensive computer system to administer its portfolio of mortgages. The computer system "orders" specific actions based on information received, but not usually reviewed, that contain certain triggering events  - all without human intervention. Indeed, much like Hal, the super computer in the film *2001*, the Wells Fargo's computer system is responsible for the daily activities that make the mortgage portfolio, or in Hal's case, the spaceship, manageable for human oversight. The problem arises when too much authority, through either an increase in actual authority or a lack of supervisory oversight, is ceded to the logic of the computer programs. And although these computer systems are designed

to be "foolproof and incapable of error," a computer system can never replace the reasoning, understanding, and logic implicit in human review. *See 2001* (computer system Hal claiming he is designed to be foolproof and incapable of error prior to taking over the spaceship and killing several crew members.)

Human review of the facts in this case would have shown the following. Beginning in December 2001, Wells Fargo conducted 44 inspections of the subject property. Several were performed on a different property entirely. Those that were performed on the subject property indicated that the home had not been abandoned, was being lived in, and indeed was being maintained. Human review of the account history would have shown that debtor continued to make monthly payments during most of this period, evidencing at least an attempt to maintain ownership of her home. If an actual person had reviewed Mrs. Stewart's account, they would have noted several duplicate charges for the same service performed on the same date. August 29, 2005, the arrival of Hurricane Katrina, and the immediate period thereafter where entire parishes were closed to their residents is seared in our collective human memories. In this case, it took personal review of the charges to uncover that Wells Fargo claimed two broker-price opinions were conducted during the immediate aftermath of Katrina.

The question for this Court becomes what is the remedy? When a claimant repeatedly and systematically files insufficient and incorrect proofs of claim in bankruptcy court due to the lack of human review of its computer accounting software, what can the Bankruptcy Court do to prevent the continued repetition of those mistakes? Wells Fargo concedes that the Bankruptcy Court would have the authority in an individual case, following an objection by debtor, to order the creditor audit and amend the proof of claim as outlined in the *Stewart* Opinion. (Rec. Doc. 53, Trans. at 19.) Appellant argues that although the conduct is systemic and clearly affects the

functioning and efficiency of the Bankruptcy Court, the judge is limited to a case-by-case remedy and then only after an objection has been filed.

Judge Bohm, of the Southern District of Texas Bankruptcy Court, has encountered similar systematic and pervasive conduct in the filing of skeletal proofs of claims. *See In re Gilbreath*, 395 B.R. 356 (Bkrtcy.S.D.Tex. 2008); *In re Prevo*, 394 B.R. 847 (Bkrtcy.S.D.Tex. 2008)(noting that "amending proofs of claim, only after the debtor files an objection, to withdraw fees that should not have been included in the first instance is unsatisfactory because it does not address the larger problem with the way mortgage companies are filing proofs of claim"); *In re Parsley*, 384 B.R. 138 (Bkrtcy.S.D.Tex. 2008). In a series of opinions and finally in a standing order, Judge Bohm has ordered that a creditor may not amend an objected to proof of claim without prior leave from the Court. *See e.g., In re DePugh*, 2009 WL 1657473, 7 (Bkrtcy.S.D.Tex. 2009). The result is that if a creditor can't demonstrate unavailability of documents or another substantial reason for the delayed filing/amendment, then the objection is decided based on the proof of claim as it existed at the time of the objection. If anything, Judge Bohm's remedy is broader than Judge Magner's in the instant case. Nevertheless, his reasoning for adopting a broader strategy to address continuing and pervasive problems in proofs of claim is compelling.

> This Court believes that the Supreme Court created Bankruptcy Rule 3001 for a reason - so that debtors and other parties in interest can see and read the documents upon which claims are based in order to make an initial assessment of their validity. This Court does not believe that the Supreme Court contemplated that creditors could ignore Bankruptcy Rule 3001's requirements unless and until a debtor complains and then cry "no harm, no foul" by producing documents that should have been produced to begin with. This latter scenario subverts the fundamental process by which the American legal system is based-that a claimant must come forward with at least some evidence that its claims are valid before collecting their due. *Raleigh v. Ill. Dep't. of Revenue*, 530 U.S. 15, 21, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) (recognizing that "the burden of proof is an essential

element of the claim itself," and that "one who asserts a claim [has] the burden of proof that normally comes with it"). Though efficiency and the speedy resolution of the claims objection process is important to keep bankruptcy cases running smoothly, such efficiency should not come at the expense of accuracy, fairness, and fundamental evidentiary requirements. Every penny that goes to pay a creditor's allowed claim necessarily diminishes the pool of funds available to pay other creditors while, at the same time, reducing the probability that the Chapter 13 debtor will be able to propose, and make payments on, a feasible plan of reorganization. Creditors are provided ample leeway to have their claims presumed valid-and to shift the evidentiary burden to the debtor-if they simply comply with Bankruptcy Rule 3001 the first time they file a proof of claim.

*In re DePugh*, 2009 WL 1657473, 7 (Bkrtcy.S.D.Tex. 2009).

The Supreme Court has stated that bankruptcy courts "are essentially courts of equity, and their proceedings inherently proceedings in equity." *Continental Illinois Nat. Bank & Trust Co. of Chicago v. Chicago, R.I. & P. Ry. Co.*, 294 U.S. 648, 675, 55 S.Ct. 595, 79 L.Ed. 1110 (1935) ("[t]he power to issue an injunction when necessary to prevent the defeat or impairment of its jurisdiction is, therefore, inherent in a court of bankruptcy."); *see also Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 360 (5th Cir. 1986)(noting the court may enter an injunction based not only on "various statutes and rules relating to sanctions" [specifically noting Bankruptcy Rule 9011] but also based on "the inherent power of the court to protect its jurisdiction and judgments and to control its docket.")

Moreover, under Section 105, the Bankruptcy Courts possess the authority to manage their dockets.

The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). "The basic purpose of section 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 COLLIER ON BANKRUPTCY ¶ 105.01 (15th ed. rev.2007.) "Bankruptcy courts, both through their inherent powers as courts and through the general grant of power in section 105, are able to police their dockets and afford appropriate relief." *Id*. at ¶ 105.01[2]. So long as the exercise of the Bankruptcy Court's equitable authority under Section 105 does not subvert other provisions of the Bankruptcy Code, Section 105 authority is interpreted liberally. *Matter of Zale Corp.*, 62 F.3d 746, 759-760 (5th Cir. 1995); see also *U.S. v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986)(noting bankruptcy courts may not "create substantive rights that are otherwise unavailable" or "constitute a roving commission to do equity.")

While Wells Fargo argues that the Bankruptcy Court exceeded her authority under section 105 by ignoring the procedural mechanisms for filing proofs of claim and objections thereto,[7] the evidence in the record establishes the opposite. (See Rec. Doc. 19 at 57.) Wells Fargo has and continues to ignore the procedural mechanisms in bankruptcy court, placing an inordinate burden upon the bankruptcy courts to in essence prepare the lender's claim for them. Wells Fargo's behavior imposes costs upon every other party or institution involved in a particular bankruptcy matter. First, it imposes additional costs on the debtor. As Judge Bohm has recognized, "the practice of filing skeletal proofs of claim and requiring the debtor to object before producing documents that should have been produced to begin with could, in the

---

[7] Appellant also argued that the Bankruptcy Court's order "modifie[d] Wells Fargo's right to collect certain fees and charges authorized by contract" and thereby exceeded the court's authority under Section 105. Based on the analysis *supra*, this Court does not find the Bankruptcy Court's actions to be a modification of any contractual right claimed by appellant and therefore it is unnecessary to address the lower court's findings as an unlawful exercise of its Section 105 authority. (*See* section III.A and III.B)

aggregate, cost Chapter 13 debtors substantial sums that could be put to better use proposing and maintaining payments on a feasible plan of reorganization." *In re DePugh*, 2009 WL 1657473, 1 (Bkrtcy.S.D.Tex. 2009). Second, the Bankruptcy Court is forced to unnecessarily expend its limited time and resources holding hearings and examining the record for each amended proof that is filed in response to debtor's objection. Congress, in enacting the Bankruptcy Abuse Prevention and Consumer Prevention Act and amending section 11 U.S.C. § 105(d), implicitly recognized two specific goals for bankruptcy courts: that a case be resolved expeditiously and economically. 11 U.S.C. § 105(d)(as amended in 2005 to require status conferences "as are necessary to further the expeditious and economical resolution of the case.") Neither of these goals can be realized by requiring the Bankruptcy Court to individually sift through each proof of claim to uncover systematic errors identified in this case and in *Jones*. Moreover, when a single large creditor, such as Wells Fargo, is afflicted by systematic accounting difficulties, the burden on the Bankruptcy Court is exponentially increased. The Bankruptcy Court's order to audit and amend is therefore well within its authority, inherent and under section 105, to protect and manage its docket.

Wells Fargo argues that the Bankruptcy Court was required to find fraud or bad faith before exercising its authority under section 105. The Fifth Circuit has never so explicitly held, despite Wells Fargo's selective quotations from precedential case law. In fact, the Fifth Circuit has recognized that the Bankruptcy Court may exercise its section 105 powers at its discretion. *Matter of Sadkin*, 36 F.3d 473, 479 (5th Cir. 1994.) In addition, Wells Fargo ignores the distinction between two different bases for its section 105 authority: 1) to enforce provisions of the Bankruptcy Code and 2) as an exercise of contempt powers. *See In re Sanchez*, 372 B.R. 289, 311 at n. 13 (Bankr.S.D.Tex. 2007)(noting distinction). In this case, the Bankruptcy Court

found appellant's proofs of claims rife with errors and lacking in explanation or substantiation. The order to audit and amend is well within the Bankruptcy Court's authority to enforce section 501 of the Bankruptcy Code, and its implementing rules of procedure 3001 and 3007.

The Bankruptcy Rules of Procedure provide supplemental authority. Bankruptcy Rule 9011(c)(1)(B) provides that on a court's own initiative, a court "may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto." Bankr. R. 9011. The types of sanctions are "limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated" and may include "directives of a non-monetary nature." Bankr. R. 9011(c)(2)(emphasis added). The Fifth Circuit has noted Bankruptcy Rule 9011 as a "mechanism[] to impose sanctions on parties who may attempt to abuse the procedural mechanisms within the bankruptcy court." *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348, 356 n. 1 (5th Cir.2008); *accord Farguson*, 808 F.2d at 360 (citing Rule 9011 as a source of authority to issue sanctions and injunctions).

Moreover, there is a continuing and affirmative duty to correct erroneous filings and claims. *See In re Engel*, 246 B.R. 784, 794 (Bankr.M.D.Pa. 2000.) Each proof of claim must be signed and criminal penalties apply to the submission of a false statement on a proof of claim. Official Bankr. Form 10: Proof of Claim; *see also In re Rangel*, 2009 WL 1531961, 9 (Bkrtcy.S.D.Tex. 2009)(noting that statements made in proof of claim are made under penalty of perjury); Bankr. R. 9011(b)(by presenting pleading or paper, party represents factual contentions have evidentiary support.) The duty to correct arises "upon learning of [the document's] inaccuracy or incompleteness." *In re Wolcott*, 194 B.R. 477, 486 (Bkrtcy.D.Mont. 1996) There is significant evidence in the record of, at a minimum, inaccurate accounting, such as duplicative

charges and charges arising after Wells Fargo's ownership of the property. This evidence certainly raises the spectre of inaccurate pleadings, which Wells Fargo would be required to audit and amend regardless of the *Stewart* Opinion.

In any event, the audit portion of the *Stewart* Opinion also does not decide the substance of any matter before the Bankruptcy Court but rather outlines the proper procedural and evidentiary requirements for a proper proof of claim. *See supra* n. 2 (finding that substance of claim not decided by order to audit and amend.) For example, Wells Fargo is ordered to file a complete loan history into the claims register. Wells Fargo is also on notice that proper documentation, including, for example, documentation of individual fees assessed, is required to achieve *prima facie* status. To the extent that it has not provided such documentation in pending claims, Wells Fargo is on notice that those claims would be denied *prima facie* status.

### F. Injunctive Relief

Wells Fargo argues that the Bankruptcy Court failed to consider the four-part test for imposing injunctive relief. (Rec. Doc. 19 at 58.) Moreover, rather than remand, Wells Fargo asks this Court to reverse the *Stewart* Opinion "because injunctive relief is . . . inappropriate in this context." (Id.)

The order for Wells Fargo to audit and amend constitutes injunctive relief.[8] As this Court has previously found, "[t]he main prerequisite to obtaining injunctive relief is a finding that plaintiff is being threatened by some injury for which he has no adequate legal remedy." *Wells*

---

[8] Douglas Laycock, MODERN AMERICAN REMEDIES 235 (2002) (noting "an injunction is a court order, enforceable by sanctions for contempt of court, directing defendant to do or refrain from doing some particular thing. The injunction against future violations of law is the simplest use of the injunction.")

*Fargo Bank, N.A. v. Jones*, 391 B.R. 577, 609 (E.D.La. 2008.)(citing 11A Charles A. Wright,

Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. Civ. 2d § 2942.) In addition, the Fifth

Circuit has applied the following four-factor test to permanent injunctions.

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).

*ITT Educational Services, Inc. v. Arce*, 533 F.3d 342, 347 (5th Cir. 2008)

Wells Fargo argues that the individual right of each debtor to object to the proof of claim

filed in their case constitutes an adequate legal remedy. While individual debtors do maintain an

individual remedy, as discussed previously, the costs accrue systemwide to debtors and the

courts. The Bankruptcy Court, in its findings on the continuing and repetitive conduct by

appellant, sufficiently addressed the inadequacy of a legal remedy on an individual claimant

basis. (Rec. Doc. 1-5 at 20-24); *see also e.g.*, 11A Charles A. Wright, Arthur R. Miller & Mary

Kay Kane, Fed. Prac. & Proc. Civ. 2d § 2944 at 89 (noting a legal remedy may be found

inadequate where "the injury is of a continuing nature.") Wells Fargo's alternative is for the

Court to bog down in an unnecessarily bloated docket caused by Wells Fargo's own poor

oversight and for public taxpayers to in effect finance Wells Fargo's continued filing of

erroneous claims.

Whether the traditional four-part test for injunctive relief, however, even applies to the

*Stewart* Opinion is unclear. As discussed *supra*, three potential bases of authority for the

Bankruptcy Court's order to audit and amend: 1) inherent authority to manage docket; 2)

statutory authority to further Bankruptcy Code provisions under section 105; and 3) as a form of

civil contempt under section 105 and Bankruptcy Rule 9011.[9] This Court has found that the Bankruptcy Court had the authority to issue the audit and amend portion of its opinion under each of the above sources of authority. In cases allowing pre-filing injunctions to deter abusive or vexatious filings, courts have relied on their inherent authority to manage their docket and have not undertaken the four-part injunctive relief test. *See e.g., Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 187 (5th Cir. 2008.) The Fifth Circuit has also affirmed Bankruptcy Court sanctions, which included an injunctive aspect, based on the Bankruptcy Court's authority to find civil contempt under section 105 and Bankruptcy Rule 9011. *In re Dansereau*, 274 B.R. 686 (Bkrtcy.W.D.Tex. 2002) *aff'd sub nom, Cash-N-Advance v. Dansereau*, 64 Fed. Appx. 417 (5th Cir. 2003).

Even if the traditional four-part test does apply, this Court finds the following factual findings sufficiently indicate the Bankruptcy Court considered the relevant factors. First, the *Stewart* opinion, unlike the *Jones* opinion, specifically found facts regarding the systemic origins and problems in Wells Fargo's presentation of proofs of claim based on its internal accounting practices. Moreover, based on evidentiary testimony, the Court concluded in *Stewart* that Wells Fargo is responsible for administering 7.7 million mortgages nationwide. Second, the Bankruptcy Court in *Stewart* found that these problems were more likely than not to recur based on continuing accounting errors following *Jones* and the lack of human oversight and management. In addition, the Court noted testimony by Wells Fargo that indicated that proofs of claim were only reviewed for accuracy *after* filing, instead of prior to filing. Third, the Court

---

[9] The *Stewart* Opinion is notably different from the *Jones* Opinion in that in *Jones*, the Bankruptcy Court ordered the injunctive relief, "new" internal accounting procedures as a punitive measure and in lieu of punitive monetary sanctions under 11 U.S.C. § 362(k)(1). (USBC, E.D.La. 06-1093, Rec. Doc. 153 at 10-16).

pointed to the inherent inefficiencies of dealing with each proof of claim individually when she found that obtaining a proper accounting of debtor's mortgage account required four months of investigation and three separate hearings.  (Rec. Doc. 1-5 at 20.)

Each of these findings and conclusions is relevant to the four-part injunctive relief test. By finding continued violations, despite *Jones*, and systemic problems, the Bankruptcy Court addressed the substance of whether or not there was an adequate remedy of law.  Given the systemic aspect of the accounting practices, the *Stewart* Opinion also demonstrated actual success and the irreparable nature of the injuries.   Because these ongoing and persistent violations have the potential to harm each Wells Fargo debtor, of which there are 7.7 million nationwide, and the cost to defendant of fulfilling its duty to provide an accurate accounting is assumed to already exist, the Court also addressed whether the potential injury outweighs the cost of the injunction and the public interest in the injunction.  The length of the process in this one case also favors a public interest in the injunction to further judicial efficiency.

### G.        *National Banking Act / OCC Regulations*

Wells Fargo argues that a national bank's real estate lending activities are immune from state visitorial control and therefore that the Bankruptcy Court's opinion violates the National Banking Act and OCC Regulations.  (Rec. Doc. 19 at 31.)  First, Wells Fargo fails to cite any legal authority that would apply the National Banking Act or the OCC Regulations to a federal bankruptcy court.  Clearly, a federal bankruptcy court is not a state entity or actor.  Appellant's argument that the public policy of "uniform standards of operation and supervision" applies equally to federal bankruptcy courts too easily could be expanded to prevent district courts or even circuit courts of appeal from deciding mortgage-related matters otherwise properly before

them.  Wells Fargo fails to even hint at a limiting principle for their argument, either in terms of geographical scope or substance.  Second, Wells Fargo claims that violative act by the Bankruptcy Court is that the court "substituted its judgment for that of Wells Fargo" regarding how appellant "protect[s] its collateral."  (Rec. Doc. 19 at 31.)  Even if appellant's tenuous application of banking law and regulations to this issue were appropriate in this case, which it is not, this Court's findings that the terms of the Note and Mortgage controlled the outcome in this case moot appellant's far-fetched argument.

## IV.    LEGAL ANALYSIS - ADMINISTRATIVE ORDER 2008-2[10]

Wells Fargo also appeals the entering of the Bankruptcy Court's Administrative Order 2008-2 on May 8, 2008.  The Order specifies the procedures for all creditors maintaining an escrow account for debtors with cases pending in Section A of the United States Bankruptcy Court for the Eastern District of Louisiana.  (Rec. Doc. 18-2.)

### A.    RESPA

Wells Fargo argues that the AO 2008-2 violates RESPA by forcing lenders to recover escrow shortages as part of the pre-petition arrearages process instead of as a more immediately payable post-petition sum.  (Rec. Doc. 18 at 14-15.)  AO2008-2 requires the escrow shortage existing at the time the bankruptcy petition was filed to be listed on the creditor's proof of claim. (Rec. Doc. 18-2).  After briefing on this issue, the Fifth Circuit addressed this specific question in *Campbell v. Countrywide Home Loans, Inc.*, 545 F.3d 348 (5th Cir. 2008.)  After noting that

---

[10] Wells Fargo made identical arguments in its two appeals of Administrative Order 2008-2 as contained in Civil Action Nos. 08-3669 and 08-3853 and in its appeal of the *Fitch* opinion in Civil Action No. 08-3852.  Accordingly, this opinion does not distinguish between the three appeals in its analysis.  *See also supra* n. 1.

what constitutes a "claim," which must be listed by a creditor in its proof of claim, is broadly defined under the Bankruptcy Code, the Court of Appeals held that unpaid escrow payments that accumulate pre-petition in the year a bankruptcy petition is filed constitute a "claim." *Id.* As such, any escrow payments that were not, but should have been, paid by the debtor before she filed her petition constitute a "pre-petition claim" and therefore can only be collected through the bankruptcy plan process and not through post-petition payments. *Id.* Accordingly, this Court finds appellant's argument foreclosed by *Campbell*.

Wells Fargo also argues that AO2008-2 violates RESPA by requiring creditors to credit a positive balance at the time of petition to any other sums owed. RESPA does note that in the event of a surplus, creditor may either refund the debtor directly or credit the escrow account to next year's sums. 24 C.F.R. 3500.17(f)(2). In the context of bankruptcy, however, where there is a clear delineation between fees and debts incurred pre-petition and those incurred post-petition and where the Bankruptcy Court evaluates both a debtor's debts as well as assets, rightly recognized that a positive balance of pre-petition escrow debt, rather than being refunded to debtor as an asset, is more properly credited to other pre-petition debt with the same lender, if it exists.

Wells Fargo's argument that RESPA is violated by the application of suspense accounts to the calculation of escrow account amounts due is discussed *supra* Section III.C. Nothing in RESPA or Regulation X prohibits the use of "suspense account" funds to reduce an initial escrow account shortage.

### B.     *Constitution and Bankruptcy Code*

Wells Fargo essentially repeats all of its arguments on how the *Stewart* Opinion exceeded

the Bankruptcy Court's authority, but instead where relevant inserts "AO2008-2" as the violative act.[11]  Wells Fargo fails to specify exactly how the administrative order violates the case or controversy requirement or otherwise violates the Constitution or Code.  For example, Wells Fargo blithely asserts that AO2008-2 preemptively adjudicates issues or disputes, but fails to specify which issues and how the administrative order resolves the dispute.  Moreover, AO2008-2 simply specifies the procedures that must be followed in filing a claim.  For example, AO2008-2 requires that escrow charges be individually listed and demonstrates how pre-petition and post-petition amounts are calculated.  Accordingly, the Court relies on its discussion *supra* Section III to address these concerns.

Wells Fargo's argument that the inclusion of the escrow shortage as a pre-petition claim is a violation of the Bankruptcy Code 11 U.S.C. §1322 is foreclosed by the Fifth Circuit's decision in Campbell as discussed *supra* Section IV.A.

C.      *Local Rule-Making Powers*

Wells Fargo asserts that the Bankruptcy Court was required to provide notice and an opportunity to be heard prior to issuing AO2008-2.  Wells Fargo fails to cite any applicable law and even appears to concede that AO2008-2 was properly enacted under Bankruptcy Rule 9029(b).  Bankruptcy Rule 9029(b) describes the procedure when there is no controlling rule:

> A judge may regulate practice in any manner consisted with federal law, these rules, Official Forms, and local rules of the district.  No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, Official Forms, or the local rules of the district unless the alleged violator has been furnished in the particular case with actual notice of

---

[11] Indeed, much of the text of this appeal is taken word for word from the appeal of the *Stewart* Opinion.

the requirement.

Nothing in 9029(b) requires notice or an opportunity to be heard. Moreover, it is a common practice for bankruptcy courts to issue standing, administrative, or general orders to regulate practice before them. For example, the federal bankruptcy court for the Middle District of Georgia enacted an administrative order forbidding the inclusion of unmatured interest in a proof of claim. 2 Bankr. Local Ct. Rules Serv, M.D.Ga. Administrative Order Governing Interest in Proofs of Claim, 28.1, Dec. 19, 1990. As previously noted, the bankruptcy court for the Southern District of Texas issued an administrative order requiring leave of the court for amendments to objected to proofs of claim. *See* Notice and Order That Federal Rule 15, as Made Applicable by Bankruptcy Rule 7015, Shall Apply Whenever an Objection to a Proof of Claim is Filed, undated (available at: http://www.txs.uscourts.gov/bankruptcy/judges/jb/notice.htm) Accordingly, the Court does not find AO2008-2 to be procedurally defective.

D.      *Permanent Injunction*

Wells Fargo argues that AO2008-2 constitutes a permanent injunction. The Court finds this argument foreclosed by the finding that AO2008-2 does not affect substantive rights but rather solely concerns and regulates procedures before Bankruptcy Court Section A. As such, it does not constitute an injunction any more than administrative orders concerning electronic filing constitute an injunction.

V.      **CONCLUSION**

Accordingly,

IT IS ORDERED that the Judgments of the Bankruptcy Court are AFFIRMED.  Wells

Fargo's appeals in civil action number 08-3225, 08-3669, 08-3852, and 08-3853 are DENIED.

New Orleans, Louisiana, this 7th day of August, 2009.


**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**